UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION OF MAINE FOUNDATION,<br><br>    Plaintiff,<br><br>    v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, and U.S. CUSTOMS AND BORDER PROTECTION,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)  Case No. 2:18-cv-00182-JDL<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

### DECLARATION OF JUSTIN A. BRISTOW

I, Justin A. Bristow, hereby declare as follows pursuant to 28 U.S.C. § 1746:

1.     I am currently the acting Freedom of Information Act ("FOIA") Coordinator for Customs and Border Protection ("CBP"), an agency within the United States Department of Homeland Security, and serve as Deputy Chief of Staff for the U.S. Border Patrol, a subcomponent of CBP.

2.     CBP is the largest federal law enforcement agency, with enforcement responsibilities for over 400 Federal statutes, on behalf of over 40 different federal agencies. CBP's primary mission is to protect the borders of the United States against terrorists and the instruments of terror, enforce the customs and immigration laws of the United States, and foster our Nation's economy by facilitating lawful international trade and travel.  CBP Officers protect America's borders at official ports of entry, while CBP's U.S. Border Patrol agents prevent illegal entry into the United States of people and contraband between the ports of entry.

3.     This case concerns the U.S. Border Patrol's Swanton and Houlton Sectors, two of twenty U.S. Border Patrol sectors.  The Houlton Sector anchors the country's northeast corner of

the Canadian border and encompasses the entire State of Maine. *See generally* U.S. Customs and Border Protection, "Houlton Sector Maine," https://www.cbp.gov/border-security/along-us-borders/border-patrol-sectors/houlton-sector-maine (last modified July 13, 2018). The Houlton Sector's focus is controlling the border area in between CBP Ports of Entry, providing Sector-related information, including Sector operations, Sector contact information, and where stations are located (in Calais, Fort Fairfield, Houlton, Van Buren, Jackman and Rangeley). The Houlton Sector additionally provides local law enforcement support for the State of Maine. The Houlton Sector's service area covers the entire State of Maine.

4. Swanton Sector's area of responsibility (AOR) includes the northern border in Vermont, New Hampshire, and part of New York. *See generally* U.S. Customs and Border Protection, "Swanton Sector Vermont," https://www.cbp.gov/border-security/along-us-borders/border-patrol-sectors/swanton-sector-vermont (last modified April 23, 2019). Swanton Sector is comprised of eight Border Patrol stations and provides support for local law enforcement within its AOR.

5. In my capacity as the acting FOIA Coordinator for CBP, I am familiar with the FOIA requests made by the American Civil Liberties Union of Maine Foundation ("ACLU") in this lawsuit. Specifically, the ACLU challenges redactions made by CBP to a handful of documents produced in this action. The redactions challenged by the ACLU concern the following:

    a.    Exemption 7(E) redactions to document entitled "**Checkpoints**." *See* Appendix pages 002, 004, 005, and 007.

    b.    Exemption 7(E) redactions to a document entitled "**Documents Report 1**." *See* Appendix pages 008-010.

      c.      Exemption 7(E) redactions to a document entitled "**U.S. Border Patrol Checkpoints**"- "**100 Air Mile Zone**," also known as "**BP Checkpoints v2.**" *See* Appendix pages 018-029.

      d.      Exemption 7(E) redaction to a document entitled "**Checkpoint 1**." *See* Appendix page 030.

      e.      Exemption 7(E) redactions to document entitled "**Checkpoint Collection Worksheet 1**." *See* Appendix pages 031-051.

      f.      Exemption 7(E) redactions to document entitled **"Immigration Checkpoint**." *See* Appendix page 052.

      g.      Exemption 7(E) redaction to a document entitled "**Checkpoint Operational Strategies and Requirements**," also referred to as "**Distro-Redacted**." *See* Appendix pages 053-054.

      h.      Exemption 7(E) redaction to a document entitled "**HLT Temporary Checkpoint Operations Collections Emphasis**," also known as "**FY17 Q4 Checkpoint Collection Plan**." *See* Appendix page 055.

      i.      Exemption 7(E) redactions to a document entitled "**Information for Illegal Immigration**." *See* Appendix pages 056-058.

    6.      The creation and implementation of effective law enforcement policies and procedures is paramount to achieving CBP's and U.S. Border Patrol's mission of protecting our Nation's border from illegal immigration. The information at issue in this case is and was compiled for law enforcement purposes and its release could lead to disclosure of CBP and U.S. Border Patrol's law enforcement techniques and procedures that could, in turn, reasonably be expected to risk circumvention of U.S. immigration laws and border enforcement.

7. Exemption 7(E) applied to "**Checkpoints**" emails on pages 002 and 004 of the Appendix protect information regarding the location of checkpoint operations and other operational details, including the staffing levels for checkpoint operations and the frequency with which such operations occur. The "Checkpoints" email at page 002 of the Appendix concerns redactions to the number of agents required to be at a checkpoint. Additionally, the redacted information includes the number of agents assigned to a Border Patrol station, the station name, and a particular area of operation. The redacted information on the "Checkpoint" email on page 004 includes a checkpoint location and the number of agents assigned to the checkpoint operation. This information is especially sensitive because it represents locations where Border Patrol is present and conducts its concentrated patrolling and enforcement activities. Furthermore, revealing staffing allocations at a particular checkpoint location would reveal the techniques and procedures of how Border Patrol conducts its enforcement activities because operational details and staffing levels are likely to remain the same for future checkpoint operations. Disclosure of such information would expose the Swanton Sector's enforcement capabilities, providing an advantage to those seeking to avoid encounters with Border Patrol; aid individuals who seek to cross the border illegally, or who seek to remain in the country illegally, to develop countermeasures to evade detection, inspection and examination; and reveal the locations and concentrations of Border Patrol agents, which could expose them to individuals who wish to bring them harm.

8. The "**Documents Report 1**" Exemption 7(E) redactions on page 009 of the Appendix concerns an email titled "FW: How is this?" that discloses locations for immigration checkpoint operations within Swanton Sector. The Agency considers such information law enforcement sensitive as the Agency will be conducting future temporary checkpoint operations

in the same locations described in the email.  Disclosure of this information would aid those seeking to evade detection or apprehension by Border Patrol by avoiding the location(s) identified in the map.   Furthermore, removing the redaction for the location of the Border Patrol Station would effectively reveal the identity of the sender of the e-mail because the title of the sender is unredacted.

9. The "**U.S. Border Patrol Checkpoints- 100 Air Mile Zone**" Exemption 7(E) redactions on page 021 of the Appendix withhold the exact location of U.S Border Patrol temporary checkpoint in relation to the U.S.-Canadian Border.  The map illustrates the location in which the U.S. Border Patrol's current and future enforcement and patrol operations will take place.  Making this information publically available, whether in Swanton Sector alone, or nationwide, would give an advantage to those seeking to avoid encounters with Border Patrol; aid individuals who seek to cross the border illegally, or who seek to remain in the country illegally, to develop countermeasures to evade detection, inspection and examination; and reveal the locations of Border Patrol agents, which could expose them to individuals who intend to harm them.  As a result, disclosure of this information would significantly increase the chances of adversaries successfully evading detection and apprehension by knowing which areas within Swanton Sector's extensive border area to avoid.  Accordingly, it is essential that the Agency maintain this information as law enforcement sensitive.

10. The **"[REDACTED] Immigration Checkpoint"** Exemption 7(E) redaction on page 030 of the Appendix withholds the precise location of an immigration checkpoint within Houlton Sector.  Furthermore, the map identifies certain locations and sites related to checkpoint operations referred to as "choke points" at which adversaries may attempt to circumvent the checkpoint.  This information is relevant to ongoing enforcement operations as U.S. Border

5

Patrol will likely utilize the same location for future checkpoint operations and deploy resources at the choke point locations to prevent adversaries from circumventing the checkpoint. Disclosure of this information would give an advantage to those seeking to avoid encounters with Border Patrol; aid individuals who seek to cross the border illegally, or who seek to remain in the country illegally, to develop countermeasures to evade detection, inspection and examination; and reveal the locations of Border Patrol agents, which could expose them to individuals who intend to harm them. Essentially, disclosure of this information would reveal the locations of the agency's primary checkpoint location in that area thereby facilitating possible identification of the best routes to penetrate Houlton Sector's extensive border area without being detected.

      11.     The "**Checkpoint Collection Worksheet 1**" Exemption 7(E) redactions withhold operational details of immigration checkpoints within Houlton Sector. The redacted information discussed below relating to checkpoint operations, staffing and asset allocation, and information collection is relevant to Border Patrol's ongoing enforcement operations as similar procedures, methods, and resources will be employed in the future.

          a. The redactions at page 031 of the Appendix withhold the name of a certain unit within the Border Patrol. Disclosing this information in this context would reveal the level of focus and resources that the Agency devotes to its enforcement operations would provide insight to individuals seeking to circumvent the law with the knowledge as to how the Border Patrol focuses its resources. The redactions found at page 033-034 of the Appendix concern maps of immigration checkpoint locations, similar to the redactions found at pages 021 and 030 of the Appendix, which are discussed above. The maps

detail the exact location of the checkpoint operation along with checkpoint-related sites and boundaries. Similarly, the map highlights choke point locations and routes near the checkpoint site that adversaries could utilize to circumvent the checkpoint. Furthermore, the map on page 034 identifies locations of Border Patrol stations and forward operating bases along with other details regarding the locations of local law enforcement personnel and assets that are used to support checkpoint operations, which are not known to the public. For example, the maps pinpoint specific areas where checkpoint and choke point locations will be supported by aerial surveillance. It is highly likely that Border Patrol will conduct future enforcement operations at the areas reflected on this map and the locations of Border Patrol facilities and assets will remain in place. Additionally, the redacted information found at page 035 ("Weekly Weather Forecast") includes a geographic description of a checkpoint operation location and the conditions in which checkpoints can operate. Releasing detailed information regarding certain conditions in which checkpoint operations can occur, would enable individuals seeking to avoid law enforcement to determine the most favorable conditions to conduct illegal activity and increase their chances of evading detection and/or apprehension. Disclosure of such information related to checkpoint locations and operating conditions would provide an advantage to those seeking to avoid encounters with Border Patrol; aid individuals who seek to cross the border illegally, or who seek to remain in the country illegally, to develop countermeasures to evade detection, inspection and examination; and reveal the locations of

      Border Patrol agents, which could expose them to individuals who intend to harm them.

  b. Pages 038-039 of the Appendix are redacted in their entirety. The documents identify particular traffic patterns, which factor into the determination of whether checkpoint operations are feasible. This information exposes how Border Patrol plans and executes its law enforcement operations. As such, disclosure of this law enforcement technique could be reasonably expected to adversely affect Border Patrol's ongoing enforcement activities as the information will likely be used in future checkpoint operations. Specifically, revealing this information could be used to circumvent the law as adversaries would learn times and dates that correspond with peak traffic patterns when checkpoint operations are more likely to be conducted. As a result, individuals could alter or adjust their travel plans and/or illegal activities to increase their chances of avoiding detection.

  c. The redactions found at pages 040-043 of the Appendix concern documents (titled: "TTPs Concealment Methods," "TTPs Utilized by Adversaries in Maine," and "Fentanyl-REDACTED-southern Maine"). This withheld information illustrates in detail certain "TTPs" -techniques, tactics, and procedures that criminal elements utilize to conceal illegal narcotics and contraband inside vehicles to avoid detection by law enforcement. The document also includes information of the techniques used to manufacture and disguise narcotics as counterfeit prescription pills. If released to the public, this information would force smugglers or other criminal elements to adapt

and/or alter their criminal activity to avoid detection by law enforcement because such information would reveal that law enforcement is actively aware and looking for the specific methods and techniques currently used to conceal, disguise, and transport contraband. As such, disclosure of this information would assist individuals in circumventing the law to employ other smuggling tactics and methods, making it more difficult for law enforcement to interdict contraband during future operations.

d. The redactions found at pages 044-046 of the document (titled: "Collection Worksheet," "Named Area of Interest (NAI)," and "REDACTED Synchronization Matrix") covers sensitive information regarding details of the Houlton Sector's immigration checkpoint operations and law enforcement procedures. The redacted material on page 044 withholds specific information relating to law enforcement procedures, including details concerning indicators of terrorist and smuggling activity, methods used to conceal contraband, and the law enforcement assets employed to counter such illegal activity. If disclosed, this information would be used to circumvent the law in that individuals would discover the techniques and assets that Border Patrol employs to identify and thwart the activities of criminal organizations. Additionally, the information on pages 045-046 includes exact geographic coordinates for checkpoints and checkpoint-related locations, details on staffing levels and enforcement assets/resources deployed at those locations, and information concerning when specific Border Patrol enforcement assets will be deployed at those locations. This information remains relevant to

      ongoing Border Patrol operations as similar staffing levels and allocation of law enforcement assets will likely apply to future checkpoint operations given Houlton Sector's limited enforcement resources. Disclosing this information to the public would provide an outline of the Houlton Sector's enforcement capabilities and therefore could be used to circumvent the law and create concern for agents' safety while conducting checkpoint operations.

e. The redactions at page 047-048 of the document (titled: "Assessments & Judgments" and "Sources") concern information that constitutes Border Patrol's procedures for collection, maintenance, consideration, and utilization of information in furtherance of its border enforcement operations. Specifically, the first bullet of the "Assessments & Judgements" document at page 047 concerns an analysis of traffic patterns; the second concerns conditions in which checkpoint operations can take place; and the third concerns the type and frequency of criminal violations encountered during checkpoint operations. The fifth and seventh bullets lay out future enforcement recommendations for interdicting smuggling and narcotics trafficking operations. Release of this information would reveal the tools and techniques that law enforcement employs and allow individuals to adapt their activities accordingly to avoid detection by law enforcement. The second, fourth, fifth, sixth, seventh, and eighth bullets listed on the "Sources" document at page 048 identify the materials that Border Patrol utilized to gather the law enforcement sensitive information. Making this information publicly available would allow individuals seeking to circumvent law

enforcement to discern the "raw materials" and information that Border Patrol uses to develop its enforcement procedures, strategies, and tactics. Additionally, page 048 includes a link that reveals the geographic coordinates of an area where Border Patrol will likely conduct future patrol and enforcement operations, that if disclosed, would give an advantage to those seeking to avoid encounters with Border Patrol; aid individuals who seek to cross the border illegally, or who seek to remain in the country illegally, to develop countermeasures to evade detection, inspection and examination; and reveal the locations of Border Patrol agents, which could expose them to individuals who wish to bring them harm. Finally, the redaction on page 050 concerns the name of a certain unit within the Border Patrol, similar to that found at page 031. Disclosing this information in this context would reveal the level of focus and resources that the Agency devotes to its enforcement operations would provide insight to individuals seeking to circumvent the law with the knowledge as to how the Border Patrol focuses its resources.

12. The "**Immigration Checkpoint**" Exemption 7(E) redaction on page 052 withholds the location of Border Patrol's checkpoint operation within Houlton Sector. The map of the immigration checkpoint location is identical to the map found at page 030 of the Appendix. As discussed in further detail above, disclosing this information to the public would allow individuals to avoid encounters with Border Patrol by circumventing or avoiding the checkpoint location because Border Patrol intends to conduct future checkpoint operations at this location. The document identifies specific locations where individuals could circumvent the checkpoint.

13. The "**Checkpoint Operational Strategies and Requirements**" Exemption 7(E) redactions at pages 053-054 of the Appendix concern certain law enforcement tactics, techniques, and procedures employed during checkpoint operations. These procedures and techniques are likely to be employed during future Border Patrol operations. The May 2018 document references internal details regarding non-public intelligence gathering procedures and techniques during checkpoint operations. Specifically, the release of information contained in the paragraph titled "Checkpoint Internal Operating Procedure" would reveal details regarding the implementation and use of certain technologies employed by the Border Patrol to collect information during checkpoint operations. As such, individuals could use this information to circumvent the law by tailoring or adapting their activities, knowing the specific information Border Patrol uses to develop their enforcement strategies. Additionally, the information withheld in the "Checkpoint Status in the [REDACTED]" paragraph outlines the frequency of checkpoint operations and contains details regarding a database in which checkpoint activity is maintained. If made available to the public, this information would reveal the how the Border Patrol collects and analyzes information during checkpoint operations and would also provide an advantage to those seeking to avoid encounters with Border Patrol, as such individuals could learn information regarding the likelihood that checkpoint operations were taking place at a given time. The paragraph "Deployment and Training of [REDACTED] at U.S. Border Patrol Checkpoints" includes details regarding the implementation and use of certain technologies, which are designed to detect materials that could be used in a terrorist attack or could pose a threat to the safety of the agents working the checkpoint. Disclosure of this information could hamper Border Patrol's enforcement activities by revealing details on the implementation and use of such technology, which would afford adversaries the means or opportunity to employ

methods to circumvent it. Furthermore, making this information publicly available would place Border Patrol agents at risk because it would disclose certain details about the technologies and devices that are used to ensure the safety of agents during checkpoint operations. Accordingly, release of this information would risk circumvention of the law.

14. The "**[REDACTED] Temporary Checkpoint Operations Collections Emphasis**" Exemption 7(E) redactions found at page 055 of the Appendix outline a number of information collection techniques utilized by U.S. Border Patrol during temporary checkpoint operations within Houlton Sector. Specifically, the document references internal details regarding information gathering procedures and methods, including discussion of non-public systems and reports, during checkpoint operations. For example, the document highlights in detail certain categories of "priority" information that Border Patrol seeks to collect during checkpoint operations. While the document references two past checkpoint operations, this information should not be released because similar collection techniques and procedures are likely to be employed at future checkpoint operations. This information would reveal the methods in which Border Patrol collects and analyzes information regarding illegal activity to further its law enforcement and border security objectives through future enforcement operations. Disclosing this information to the public would make known the focus of Border Patrol in conducting checkpoint operations, which adversaries could use to evade apprehension. As such, the release of such information would risk circumvention of the law.

15. The "**Information for Illegal Immigration**" Exemption 7(E) redactions on pages 056-058 of the Appendix withhold details concerning records and information compiled for law enforcement purposes that are not accessible to the public. This withheld information covers sensitive information regarding the Houlton Sector's collection, maintenance, consideration, and

utilization of intelligence information in furtherance of its law enforcement mission. For example, the withheld information on Appendix pages 056-058 concern specific internal incident numbers, event codes, and details regarding apprehensions. Although the information does not relate to active investigations, Border Patrol maintains this information as investigative data that allows Border Patrol to identify and prevent future illegal border activity. As such, the withheld information has continuing relevance to Houlton Sector's patrol and enforcement operations. Disclosing this information to the public could reveal certain areas that are vulnerable to illegal activity and/or how the Agency deploys its resources, which criminal elements could exploit to their advantage. Additionally, disclosure of this information would reveal the certain investigative data that is useful to Border Patrol in planning its enforcement strategies and objectives. Finally, disclosure of the this information could assist unauthorized users who gain improper access to law enforcement databases in deciphering the meaning of the internal incident numbers and codes.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: February 5, 2020

/s/ Justin A. Bristow
Justin A. Bristow
Acting FOIA Coordinator
Deputy Chief of Staff
U.S. Border Patrol
U.S. Customs and Border Protection
U.S. Department of Homeland Security