## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| *AMERICAN CIVIL LIBERTIES* | ) | |
| *UNION OF MAINE FOUNDATION,* | ) | |
| *et al.,* | ) | |
| | ) | |
| *Plaintiffs* | ) | |
| | ) | |
| *v.* | ) | *No. 2:18-cv-00182-JDL* |
| | ) | |
| *U.S. DEPARTMENT OF HOMELAND* | ) | |
| *SECURITY, et al.,* | ) | |
| | ) | |
| *Defendants* | ) | |

## MEMORANDUM DECISION AND ORDER ON OBJECTION TO PUBLIC RECORD REDACTIONS PURSUANT TO FOIA

In this litigation as narrowed by agreements of the parties, Plaintiffs American Civil Liberties Union of Maine Foundation, American Civil Liberties Union of New Hampshire Foundation, and American Civil Liberties Union Foundation of Vermont (collectively, the "ACLU") object to redactions made by defendant U.S. Customs and Border Protection ("CBP") in response to the ACLU's request pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 *et seq.*, for public records bearing on immigration enforcement in Maine, New Hampshire, and Vermont. *See* Complaint for Declaratory and Injunctive Relief for Violation of the Freedom of Information Act, 5 U.S.C. § 552 *et seq.* ("Complaint") (ECF No. 1) ¶ 2; Objection to Redaction of Public Records ("Objection") (ECF No. 46) at 1-4, 18-19; Defendants' Response to Plaintiff's Objection to Redaction of Records ("Response") (ECF No. 54) at 2 n.1; Reply in Opposition to Defendants' Redaction of Public Records ("Reply") (ECF No. 57) at 1 n.1, 2 n.2.[1]

---

[1] The ACLU did not seek the disclosure of material redacted by co-defendant U.S. Department of Homeland Security. *See* Objection at 1. Prior to the filing of the ACLU's Objection, the parties agreed to the release of email domain names in all records produced by CBP and co-defendant U.S. Immigration and Customs Enforcement ("ICE") in this

Remaining disputed redactions implicate the application of 5 U.S.C. § 552(b)(7)(E), commonly referred to as FOIA "Exemption 7(E)," to information regarding the location, method of operation, and purpose of checkpoints, *see* Reply at 1-2.  After reviewing the parties' briefs and supplemental materials and conducting an *in camera* review of the unredacted disputed materials, I overrule the ACLU's objection to the redaction of most, but not all, of those materials, and with respect to materials as to which the objection is sustained, order CBP to produce, no later than July 20, 2020, versions of those documents consistent with my rulings, below.  I further order that CBP and ICE produce, by the same date, versions of the documents consistent with their voluntary agreements to release certain material they had previously redacted, as detailed below.

## I. Applicable Legal Standard

"The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978).  As a result, FOIA requires federal agencies to promptly release records in response to a request for production, *see* 5 U.S.C. § 552(a)(3)(A), and authorizes federal courts "to enjoin [an] agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant[,]" *id.* § 552(a)(4)(B).  However, to "safeguard[ ] the efficient administration of the government, the FOIA provides that certain categories of materials are exempted from the general requirements of disclosure." *Carpenter v. U.S. Dep't of Justice*, 470 F.3d 434, 438 (1st Cir. 2006).  The agency bears the burden of proving that the withheld materials fall within an enumerated

---

lawsuit, *see* Objection at 18-19, and prior to the filing of the defendants' response, without admitting that any of its redactions were improper, ICE agreed to release all remaining material that it had previously redacted, leaving CBP the agency responsible for the sole remaining disputed redactions, *see* Response at 2 & n.1; Reply at 1 n.1.  In CBP's response, without admitting that any of its redactions were improper, CBP consented to the release of additional material, further narrowing the scope of the dispute.  *See* Response at 4 n.4, 5 n.7, 6 n.9, 7 n.10, 10 nn.13-14, 13 n.15, 16 n.16, 17 n.17, 18 n.18, 19 n.19, 20 n.20, 22 n.21, 24 n.22.

exemption.  *See* 15 U.S.C. § 552(a)(4)(B).  FOIA exemptions are construed narrowly, and any

doubts are resolved in favor of disclosure.  *See Carpenter*, 470 F.3d at 438 (citing *U.S. Dep't of*

*Justice v. Julian*, 486 U.S. 1, 8 (1988)).

CBP asserts that all remaining contested redactions are subject to Exemption 7(E), which

shields from disclosure:

> records or information compiled for law enforcement purposes, but only to the
> extent that the production of such law enforcement records or information . . .
> would disclose techniques and procedures for law enforcement investigations or
> prosecutions, or would disclose guidelines for law enforcement investigations or
> prosecutions if such disclosure could reasonably be expected to risk circumvention
> of the law[.]

15 U.S.C. § 552(b)(7)(E).

Exemption 7(E) "sets a relatively low bar for [an] agency to justify withholding, requiring

only that the agency demonstrate logically how the release of the requested information might

create a risk of circumvention of the law."  *Widi v. McNeil*, 2:12-cv-00188-JAW, 2016 WL

4394724, at *28 (D. Me. Aug. 16, 2016) (citations and internal quotation marks omitted), *recon.*

*granted in part on other grounds*, 2017 WL 1906601 (D. Me. May 8, 2017); *see also Am. Civil*

*Liberties Union of Me. Found. v. U.S. Dep't of Homeland Sec.* ("*ACLU of Me.*"), 2:18-cv-00176-

JDL, 2019 WL 2028512, at *4 (D. Me. May 8, 2019) (concluding that techniques and procedures

"bear[ing] on continuing law enforcement activities" were properly redacted under Exemption

7(E) (citing *Families for Freedom v. U.S. Customs & Border Prot.*, 837 F. Supp. 2d 287, 299

(S.D.N.Y. 2011))).  "[T]he exemption looks not just for circumvention of the law, but for a risk of

circumvention; not just for an actual or certain risk of circumvention, but for an expected risk; not

just for an undeniably or universally expected risk, but for a reasonably expected risk; and not just

for certitude of a reasonably expected risk, but for the chance of a reasonably expected risk." *Blackwell v. FBI*, 646 F.3d 37, 42 (D.C. Cir. 2011) (citation and internal quotation marks omitted).[2]

Implicit in this analysis is that "law enforcement techniques or procedures that are universally known to the public cannot be shielded from disclosure under the Act." *Broward Bulldog*, 939 F.3d at 1191; *see also ACLU of Me.*, 2019 WL 2028512, at *2. "But even for well-known techniques or procedures, Exemption 7(E) protects information that would reveal facts about such techniques or their usefulness that are not generally known to the public, as well as other information when disclosure could reduce the effectiveness of such techniques." *Broward Bulldog*, 939 F.3d at 1191 (noting, for example, that "while the public is generally aware of the Bureau's National Crime Information Center databases, details of their use and whether individuals are mentioned in them is not known to the public") (citing *Vazquez v. U.S. Dep't of Justice*, 887 F. Supp. 2d 114, 116-17 (D.D.C. 2012)); *see also Am. Civil Liberties Union Found. of Ariz. v. United States Dep't of Homeland Sec.* ("*ACLU of Ariz.*"), No. CV-14-02052-TUC-RM (BPV), 2017 WL 8895339, *26 (D. Ariz. Jan. 26, 2017) (rec. dec., *dismissed by stip. of parties*, Feb. 15, 2018) ("in general, the government is not required to disclose all details concerning law enforcement techniques simply because some aspect of it is known to the public").

To establish their entitlement to a FOIA exemption, agencies typically submit a so-called "*Vaughn* index" – "[a] comprehensive list of all documents that the government wants to shield from disclosure in . . . [FOIA] litigation, each document being accompanied by a statement of

---

[2] There is a split among the circuit courts of appeals as to whether the showing that "disclosure could reasonably be expected to risk circumvention of the law" must be made solely with respect to guidelines or with respect to both guidelines and techniques and procedures. *See Broward Bulldog, Inc. v. U.S. Dep't of Justice*, 939 F.3d 1164, 1194 (11th Cir. 2019) (summarizing circuit court split but concluding that it "need not take a side here" because "[e]ven if this [circumvention of law] provision applies to "techniques and procedures[,]" the [defendant] has met that burden"). Insofar as appears, the First Circuit has not had occasion to rule on the issue. However, as noted above, this court has construed Exemption 7(E) to require that the showing be made with respect to both. *See Widi*, 2016 WL 4394724, at *28; *see also ACLU of Me.*, 2019 WL 2028512, at *1 (same).

4

justification for nondisclosure[.]" *N.H. Right to Life v. U.S. Dep't of Health & Human Servs.*, 778 F.3d 43, 48 n.3 (1st Cir. 2015) (citation and internal quotation marks omitted). However, in instances in which a *Vaughn* index is inadequate, "the court has various options for proceeding[:] [i]t could choose to permit discovery limited to specified documents, it could conduct an *in camera* review of selected documents, it could order release of some documents, or it could direct a combination of these procedures." *Church of Scientology Int'l v. U.S. Dep't of Justice*, 30 F.3d 224, 240 (1st Cir. 1994) (footnote omitted).

In this case, CBP both submitted a *Vaughn* index to accompany a redacted appendix of disputed material and provided the court with an unredacted version of the appendix for *in camera* review. *See* [CBP] *Vaughn* Index, Exh. B (ECF No. 45-2) to Status Report (ECF No. 45); *see also* [Redacted] Appendix ("Appendix") (ECF No. 41-1), attached to Appendix [Cover Sheet] (ECF No. 41). The ACLU challenged the adequacy of CBP's *Vaughn* index and argued that CBP's submission of documents for *in camera* review did not rectify the deficiency. *See* Objection at 11 & n.5. CBP then, in conjunction with its response, filed the detailed declaration of Justin A. Bristow, the acting FOIA Coordinator and Deputy Chief of Staff for the U.S. Border Patrol. *See* Declaration of Justin A. Bristow ("Bristow Decl.") (ECF No. 53). The ACLU did not renew its objection to the deficiency of CBP's *Vaughn* index, focusing on the merits of the application of Exemption 7(E). *See generally* Reply.

"The district court must make a *de novo* determination as to the validity of [an] agency's exemption claim[,]" *Providence Journal Co. v. U.S. Dep't of Army*, 981 F.2d 552, 556-57 (1st Cir. 1992), but is required to give "substantial weight" to agency declarations, which "must describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemptions, and show that the justifications

are not controverted by contrary evidence in the record or by evidence of [agency] bad faith[,]" *Hunt v. CIA*, 981 F.2d 1116, 1119 (9th Cir. 1992). "If the affidavits contain reasonably detailed descriptions of the documents and allege facts sufficient to establish an exemption, the district court need look no further." *Citizens Comm'n on Human Rights v. FDA*, 45 F.3d 1325, 1329 (9th Cir. 1995) (citation and internal quotation marks omitted). An agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible. *See*, *e.g.*, *Hamdan v. U.S. Dep't of Justice,* 797 F.3d 759, 774 (9th Cir. 2015).

## II.  Discussion

### A.  ACLU Arguments Overruled

The ACLU devotes a significant portion of its argument against continued redaction of the disputed material to issues irrelevant to the analysis of whether CBP meets its burden to show the propriety of its redactions pursuant to Exemption 7(E). First, it contends that, because checkpoint operations are invasive procedures subject to Fourth Amendment review for reasonableness, the release of such information is crucial to furthering "the basic purpose of the FOIA": "to ensure an informed citizenry . . . needed to check against corruption and to hold the governors accountable to the governed[.]" Reply at 1 (citation and internal quotation marks omitted); *see also id.* at 1, 7-11; Objection at 13.

Yet, were this the standard to gauge the appropriateness of redactions pursuant to Exemption 7(E), the rule would swallow the exception crafted by Congress. While "the statute manifests an overall policy of broad disclosure of government documents to ensure an informed citizenry[,] . . . that mandate, though sweeping, is far from absolute." *Irons v. FBI*, 811 F.2d 681, 685 (1st Cir. 1987) (citation and internal quotation marks omitted). "[T]o preserve certain vital government interests and to protect individuals where necessary, Congress promulgated a series

of explicit exemptions from the revelatory norm." *Id.* (citing 5 U.S.C. § 552(b)(1)-(9), the "exemptions"). Accordingly, the FOIA directs that "[a]n agency *shall . . .* withhold information. . . if . . . the agency reasonably foresees that disclosure would harm an interest protected by an exemption described in subsection (b) . . . [or] disclosure is prohibited by law[.]" 5 U.S.C. § 552(a)(8)(A)(i) (emphasis added) (referencing subsection 552(b)).

Next, the ACLU contends that, because the defendants previously have released information to justify their use of border checkpoints, both in court and "in the court of public opinion" through press releases, they cannot "use public records as both a sword and a shield" and seek protection of checkpoint information in this case. Objection at 3-4; *see also id.* at 7; Reply at 9. For this proposition, the ACLU cites *United States v. Martinez-Fuerte*, 428 U.S. 543 (1976), *Rosenfeld v. Dep't of Justice*, 57 F.3d 803, 815 (9th Cir. 1995), and *ACLU of Ariz.*, 2017 WL 8895339, at *6. Yet, none of these authorities stands for the stated proposition.[3]

Finally, the ACLU contends that the information sought to be shielded – checkpoint locations, methods of operation, and purposes – either is inherently public because in open view (for example, location), *see* Objection at 7 (citing *ACLU of Ariz.*, 2017 WL 8895339, at *8) or "has historically been public[,]" *id.* at 8, 10 (citing *Martinez-Fuerte*, 428 U.S. at 553 & n.15, 565-66); *see also* Reply at 2-7 (citing *Martinez-Fuerte*, 428 U.S. at 554 n.10, 565-66; *United States v. Pollack*, 895 F.2d 686, 687 (10th Cir. 1990); *ACLU of Me.*, 2019 WL 2028512, at *3; *United States v. Ruiz-Hernandez*, No. CR 16-511-TUC-CKJ, 2017 WL 1047236, at *3 (D. Ariz. Mar. 17, 2017),

---

[3] *Martinez-Fuerte* concerned not the application of the FOIA but, rather, the reasonableness pursuant to the Fourth Amendment of stops made at permanent immigration checkpoints in California and Texas, *see Martinez-Fuerte*, 428 U.S. at 545-50, *Rosenfeld* held that Exemption 7(E) did not shield a reference to the well-known enforcement technique of a pretext phone call merely because of its application to a specific individual, *see Rosenfeld*, 57 F.3d at 815, and *ACLU of Ariz.* observed that the government had failed to establish that "the location of checkpoints nationwide" qualified for "exemption under 7(E)[,]" creating "substantial doubt as to the reasonableness" of its "decision not to search for responsive records[,]" *ACLU of Ariz.*, 2017 WL 8895339, at *6-8.

*aff'd* 751 F. App'x 1022 (9th Cir. 2019); *ACLU of Ariz.*, 2017 WL 8895339, at *8, *27-28; *United States v. Ruiz*, No. CR 16-121-TUC-CKJ, 2016 WL 6828197, at *3 (D. Ariz. Nov. 18, 2016)). Yet, these cases do not stand for the proposition that the subject matter of any of the disputed redactions should be deemed public as a matter of law for purposes of analysis of whether CBP has met its Exemption 7(E) burden.[4]

To the extent that the ACLU invokes these arguments in opposition to specific redactions, its objection on these bases is overruled.

### B. Remaining Disputed Redactions

Turning next to the specific redactions at issue, with the benefit of Bristow's declaration and *in camera* review of the documents at issue, I rule as follows.[5]

### 1. Checkpoint Details in Emails, Charts, Appendix at 002, 004-05, 007, 009, 045-46

The first set of disputed redactions concerns CBP's removal from (i) identical emails titled "Checkpoints[,]" Appendix at 002, 007, of the number of agents required to be at a checkpoint, the number of agents assigned to a Border Patrol station, the station name, a particular area of operation, and the number of K-9 assets assigned to a checkpoint operation, *see* Response at 4, (ii)

---

[4] *Martinez-Fuerte*, *Pollack*, *Ruiz-Hernandez*, and *Ruiz* are not FOIA cases.  *See Martinez-Hernandez*, 428 U.S. at 545-50; *Pollack*, 895 F.2d at 687; *Ruiz-Hernandez*, 2017 WL 1047236, at *1; *Ruiz*, 2016 WL 6828197, at *1.  While the remaining cases are FOIA cases, *Rosenfeld* did not concern whether border checkpoint information is widely known, *see Rosenfeld*, 57 F.3d at 815, the cited passage of *ACLU of Me.* addressed the question of whether U.S. Border Protection guidance on how to interact with passengers qualified for protection pursuant to Exemption 7(E), concluding after *in camera* review of the unredacted version that it did not because the information "relate[d] to the Supreme Court's holding in *United States v. Drayton*, 536 U.S. 194 (2002)," and, thus, did not implicate investigative techniques not generally known to the public, *see ACLU of Me.*, 2019 WL 2028512, at *2, and, while the court in *ACLU of Ariz.* did state that, "[i]n this day and age, with the use of cell phones, other electronic means, and even drones, the location of a checkpoint can hardly be secret[,]" *ACLU of Ariz.*, 2017 WL 8895339, at *8, it did so in the context of rejecting the government's position that it need not have even *searched* for national checkpoint data because such records are "categorically exempt from disclosure[,]" *id*. at *7, directing the government "to search for the requested data with regard to checkpoint locations and either disclose it or produce a *Vaughan* index and accompanying affidavits, raising whatever exemptions it contends may be appropriate[,]" *id*. at *8.
[5] I have grouped sets of disputed redactions in the same manner as did the ACLU in its reply brief, *see* Reply at 2-11, except that I have grouped the materials on pages 045-46 of the Appendix with those on pages 002, 004-05, 007, and 009, the materials on page 035 and the first two bullet points on page 047 with the materials on pages 038-39, and the fourth bullet point on page 047 with the materials on pages 040-44.

identical emails titled "Checkpoint[,]" Appendix at 004-05, of a checkpoint location and the number of agents who would be present there, *see id.* at 5, and (iii) an email titled "FW: How is this?[,]" Appendix at 009, of a checkpoint location, *see id.* at 5-6, as well as CBP's redaction of all but the titles of two charts, Appendix at 045-46, that contain "precise coordinates for checkpoints and checkpoint-related locations, list law enforcement assets that are appropriate for deployment at the various listed locations, and list times during which law enforcement assets will be deployed at th[ose] locations[,]" *id.* at 16.  For the reasons that follow, I sustain the ACLU's objections in part, with respect to two redactions from the body of the "FW: How is this?" email, and otherwise overrule them.

As concerns the "FW: How is this?" email, Bristow states that the redacted portions disclose "locations for immigration checkpoint operations within Swanton Sector" that CBP considers sensitive as it "will be conducting future temporary checkpoint operations in the same locations described in the email[,]" asserting that "[d]isclosure of this information would aid those seeking to evade detection or apprehension by Border Patrol by avoiding the location(s) identified in the map."  Bristow Decl. ¶ 8.  However, while the location described in the signature block is specific, the location redacted twice from the body of the email is a route upon which checkpoints take place that spans hundreds of miles, undercutting the plausibility of Bristow's conclusion that its disclosure "could reasonably be expected to risk circumvention of the law[.]"  5 U.S.C. § 552(b)(7)(E).  CBP, hence, carries its burden to demonstrate the necessity of the redaction of the location from the signature block but not of the location mentioned twice in the body of the email.

As concerns the "Checkpoints*"* and *"*Checkpoint" emails, Bristow explains that the redacted information is "especially sensitive because it represents locations where Border Patrol is present and conducts its concentrated patrolling and enforcement activities[,]" asserting that

"revealing staffing allocations at a particular checkpoint location would reveal the techniques and procedures of how Border Patrol conducts its enforcement activities because operational details and staffing levels are likely to remain the same for future checkpoint operations."  Bristow Decl. ¶ 7.  Bristow plausibly concludes that "[d]isclosure of such information would expose the Swanton Sector's enforcement capabilities, providing an advantage to those seeking to avoid encounters with Border Patrol; aid individuals who seek to cross the border illegally, or who seek to remain in the country illegally, to develop countermeasures to evade detection, inspection and examination; and reveal the locations and concentrations of Border Patrol agents, which could expose them to individuals who wish to bring them harm."  *Id.* ¶ 7.  CBP, hence, carries its burden to demonstrate that the redacted material contains "techniques and procedures for law enforcement investigations[,]" the disclosure of which "could reasonably be expected to risk circumvention of the law[.]" 5 U.S.C. § 552(b)(7)(E); *see also, e.g.*, *ACLU of Me.*, 2019 WL 2028512, at *2 (upholding the government's redactions under Exemption 7(E) of shift logs "contain[ing] information covering . . . staffing levels, shift hours, zone assignments, [and] zone boundaries" that the government indicated had "continuing relevance to its present patrolling and enforcement activities") (citation and internal quotation marks omitted).

As concerns the charts on pages 045-46 of the Appendix, Bristow correctly notes that the redacted information "includes exact geographic coordinates for checkpoints and checkpoint-related locations, details on staffing levels and enforcement assets/resources deployed at those locations, and information concerning when specific Border Patrol enforcement assets will be deployed at those locations."  Bristow Decl. ¶ 11(d).  He represents that "[t]his information remains relevant to ongoing Border Patrol operations as similar staffing levels and allocation of law enforcement assets will likely apply to future checkpoint operations given Houlton Sector's limited

10

enforcement resources." *Id*.   He plausibly concludes that "[d]isclosing this information to the public would provide an outline of the Houlton Sector's enforcement capabilities and therefore could be used to circumvent the law and create concern for agents' safety while conducting checkpoint operations." *Id*.   CBP, hence, carries its burden to show that the redacted material contains "techniques and procedures for law enforcement investigations[,]" the disclosure of which "could reasonably be expected to risk circumvention of the law[.]" 5 U.S.C. § 552(b)(7)(E); *see also, e.g., ACLU of Me.*, 2019 WL 2028512, at *2.[6]

### 2.  Checkpoint Location Maps, Appendix at 021, 030, 033-34, 052

This set of disputed redactions involves maps that CBP redacts to prevent revelation of "precise" locations of checkpoints, checkpoint-related sites and boundaries, personnel, and/or operations.   Response at 6-12, 19-20; Appendix at 021 ("100 Air Mile Zone"), 030 ("[REDACTED] Immigration Checkpoint") (duplicated at Appendix at 052; nearly identical to Appendix at 033), 034 (map redacted in its entirety).   For the reasons that follow, I overrule the ACLU's objections to the redaction of these documents.

While the underlying maps themselves are no secret, information has been added to them and/or noted beneath them that Bristow represents is nonpublic and of relevance to continuing operations.  *See* Bristow Decl. ¶ 9 (100 Air Mile Zone map "illustrates the location in which the U.S. Border Patrol's current and future enforcement and patrol operations will take place"), *id*. ¶ 10 (Immigration Checkpoint map details "precise location of an immigration checkpoint within Houlton Sector" and "identifies certain locations and sites related to checkpoint operations referred to as 'choke points' at which adversaries may attempt to circumvent the checkpoint"; the Border

---

[6] As concerns the disputed redactions on pages 045-46 of the Appendix, the ACLU asserts that CBP has not satisfied its burden to show that this information, "much" of which it claims is relevant despite conceding that it is two years old, remains relevant to current operations. Reply at 8 (quoting Response at 16).  However, as discussed above, Bristow's declaration suffices to carry CBP's burden on this point.  *See* Bristow Decl. ¶ 11(d).

Patrol "will likely utilize the same location for future checkpoint operations and deploy resources at the choke point"); *id*. ¶ 11(a) (map on page 034 of Appendix "identifies locations of Border Patrol stations and forward operating bases along with other details regarding the locations of law enforcement personnel and assets that are used to support checkpoint operations, which are not known to the public[,]" such as "specific areas where checkpoint and choke point locations will be supported by aerial surveillance"; "[i]t is highly likely that Border Patrol will conduct future enforcement operations at the areas reflected on this map and the locations of Border Patrol facilities and assets will remain in place").

Bristow plausibly concludes that the above information could aid those seeking to avoid encounters with the Border Patrol to develop countermeasures to evade detection, inspection, and examination and reveal the locations of Border Patrol agents, exposing them to individuals who intend to cause them harm. *Id.* ¶¶ 9, 10, 11(a).  CBP, hence, demonstrates that the redacted material contains "techniques and procedures for law enforcement investigations[,]" the disclosure of which "could reasonably be expected to risk circumvention of the law[.]" 5 U.S.C. § 552(b)(7)(E); *see also, e.g., ACLU of Me.*, 2019 WL 2028512, at *2.

### 3. Units within Border Patrol, Appendix 031, 050

This set of disputed redactions pertains to "the name of a certain unit within U.S. Border Patrol" in the documents titled "Houlton Sector" and "Contact Information[,]" *see* Response at 10 (citing Bristow Decl. ¶ 11(a); Appendix at 031), 19 (citing Bristow Decl. ¶ 11(e); Appendix at 050).  I sustain the ACLU's objection to the redaction of these materials, *see* Reply at 5-6, concluding that CBP fails to carry its burden to demonstrate that the mere name of a unit qualifies

as a technique or procedure of law enforcement or that its disclosure "could reasonably be expected to risk circumvention of the law[.]"  5 U.S.C. § 552(b)(7)(E).[7]

CBP asserts that the name constitutes a technique or procedure for law enforcement investigations but fails to explain why.  *See* Response at 10, 19.  Nor is the matter self-evident. Bristow represents that "[d]isclosing this information in this context would reveal the level of focus and resources that the Agency devotes to its enforcement operations [and] would provide insight to individuals seeking to circumvent the law with the knowledge as to how the Border Patrol focuses its resources."  Bristow Decl. ¶¶ 11(a), 11(e).  However, he, too, offers no explanation as to why the revelation of a unit name would reveal the level of focus and resources devoted to enforcement operations, *see id*., and this, too, is not self-evident.

### 4.  Weather, Traffic Pattern Analyses, Appendix at 035, 038-39, & 047 (1st, 2d bullet points)

The next set of disputed redactions concerns the redaction of weather and traffic "conditions in which checkpoint operations can take place."  Response at 12-14, 16-17 (citing Bristow Decl. ¶¶ 11(a) (weather), 11(b) (traffic), 11(e) (weather and traffic)).  CBP redacts from the "Weekly Weather Forecast" document, Appendix at 035, the location of a checkpoint operation and checkpoint-related locations as well as conditions in which checkpoint operations can take place.  *See id*. at 12.  It redacts the traffic pattern documents, Appendix at 038-39, which "identify particular traffic patterns that are relevant to a determination of the proper conditions for checkpoint operations[,]" in their entirety.  *Id*. at 13.  Finally, it redacts the first bullet point and part of the second bullet point, Appendix at 047, which also concern traffic patterns and weather in which operations can take place.  *See id*. at 16-17; Bristow Decl. ¶ 11(e).

---

[7] "[T]he phrase 'techniques and procedures[]' . . . refers to how law enforcement officials go about investigating a crime."  *Allard K. Lowenstein Int'l Human Rights Project v. Dep't of Homeland Sec.*, 626 F.3d 678, 682 (2d Cir. 2010) (observing that a "'technique'" is defined as "'a technical method of accomplishing a desired aim'" and a "'procedure' as 'a particular way of doing or of going about the accomplishment of something'").

For the reasons that follow, I overrule the ACLU's objections to this set, concluding that CBP carries its burden to show that the redacted material contains "techniques and procedures for law enforcement investigations[,]" the disclosure of which "could reasonably be expected to risk circumvention of the law[.]" 5 U.S.C. § 552(b)(7)(E); *see also, e.g.*, *ACLU of Me.*, 2019 WL 2028512, at *2.

As in the case of maps, weather conditions and traffic patterns are not in themselves nonpublic or protectible.  However, as Bristow represents, the documents at issue reveal strategies for determining the weather conditions and traffic patterns in which checkpoint operations can occur.  *See* Bristow Decl. ¶¶ 11(a), 11(b), 11(e).  Bristow plausibly concludes that disclosure of these operational strategies could aid those seeking to avoid encounters with the Border Patrol to develop countermeasures to evade detection.  *See id.*  CBP, hence, carries its burden to demonstrate the propriety of these redactions.

**5. TTP,  Collection Worksheet Documents, Appendix at 040-44 & 047 (4th bullet point)**

This set of disputed redactions pertains to documents concerning techniques, tactics, and procedures ("TTP") used by individuals to evade the law as well as to certain law enforcement procedures to counter such operations.  *See* Response at 14-15 (TTP, Appendix at 040-43), 15 (countermeasures, Appendix at 044), 17 (TTP, Appendix at 047, fourth bullet point).  For the reasons that follow, I overrule the ACLU's objections to this set, concluding that CBP carries its burden to show that the redacted material contains "techniques and procedures for law enforcement investigations[,]" the disclosure of which "could reasonably be expected to risk circumvention of the law[.]" 5 U.S.C. § 552(b)(7)(E); *see also, e.g.*, *ACLU of Me.*, 2019 WL 2028512, at *2.

Four of the TTP documents "relate to T[T]Ps encountered by law enforcement related to the concealment of narcotics and weapons[,]" Response at 14, 17 (citing Appendix at 040-42, 047

(fourth bullet point)), and the fifth "describes T[T]Ps encountered by law enforcement regarding the production of counterfeit prescription medicine[,]" *id*. at 14 (citing Appendix at 043).  The final document, titled "Collection Worksheet[,]" contains "detailed information regarding law enforcement procedures, including known indicators of terrorist activity and methods of concealment of contraband . . . [and] specific law enforcement assets to be employed to counter smuggling and terrorist operations." *Id.* at 15 (citing Appendix at 044).  CBP redacted all but titles or portions thereof from the documents at Appendix at 040-44 and, as relevant to this set of disputed redactions, the fourth bullet point from the document at Appendix at 047.

Bristow plausibly concludes that (i) disclosure of the TTP material "would assist individuals in circumventing the law to employ other smuggling tactics and methods, making it more difficult for law enforcement to interdict contraband during future operations[,]" Bristow Decl. ¶ 11(c), and (ii) disclosure of law enforcement tactics and procedures used to counter terrorist and smuggling activity "would be used to circumvent the law in that individuals would discover the techniques and assets that Border Patrol employs to identify and thwart the activities of criminal organizations[,]" *id*. ¶ 11(d).  CBP, hence, carries its burden to demonstrate the propriety of these redactions.[8]

### 6. "Assessments & Judgments" and "Sources," Appendix at 047 (3rd, 5th, 7th bullet points) and 048 (2nd, 4th-8th bullet points)

This set of disputed redactions concerns CBP's redactions of the third, fifth, and seventh bullet points in an "Assessments & Judgments" document, *see* Appendix at 047, and the second and fourth through eighth bullet points in a "Sources" document, *see id*. at 048.  *See* Response at

---

[8] The ACLU contends that the large blocks of redactions on pages 040-044 of the Appendix indicate that CBP has failed to comply with its mandate to isolate material eligible to be redacted pursuant to Exemption 7(E) from other reasonably segregable portions of the record.  *See* Reply at 8.  I disagree, concluding that CBP has properly redacted the entirety of those documents.

16-19; Reply at 8-10.  For the reasons that follow, I sustain the ACLU's objections in part, with respect to the third bullet point on page 047 of the Appendix, which contains data on criminal violations encountered that cannot fairly be characterized as a "technique" or "procedure," and otherwise overrule them, concluding that CBP carries its burden to show that the remainder of the material redacted from these documents contains "techniques and procedures for law enforcement investigations[,]" the disclosure of which "could reasonably be expected to risk circumvention of the law[.]" 5 U.S.C. § 552(b)(7)(E); *see also, e.g.*, *ACLU of Me.*, 2019 WL 2028512, at *2.

### a.  "Assessments & Judgments" Document

Bristow explains that the third bullet point on page 047 of the Appendix "concerns the type and frequency of criminal violations encountered during checkpoint operations."  Bristow Decl. ¶ 11(e).  CBP asserts that this information constitutes a technique and procedure of law enforcement, *see* Response at 17, but neither CBP nor Bristow explains how this data constitutes a technique or procedure, and the matter is not self-evident.  CBP, hence, fails to carry its burden to show that this material qualifies for protection pursuant to Exemption 7(E).  *See*, *e.g.*, *Am. Civil Liberties Union Found. of Mass. v. FBI*, Civil Action No. 14-cv-11759, 2016 WL 4411492, at *6 (D. Mass. Aug. 17, 2016) (denying protection to "[t]he total number of open investigations" under Exemption 7(E) as "too generic to constitute a technique or procedure of law enforcement; it does not disclose how the FBI's Boston Field Office investigates crimes or disclose any investigative trends").

I reach a different conclusion with respect to the material in the fifth and seventh bullet points, which Bristow notes "lay out future enforcement recommendations for interdicting smuggling and narcotics trafficking operations."  Bristow Decl. ¶ 11(e).  He plausibly concludes that disclosure of this information "would reveal the tools and techniques that law enforcement employs and allow individuals to adapt their activities accordingly to avoid detection by law

enforcement." *Id*.  CBP, thus, carries its burden to demonstrate the appropriateness of the redaction

of this material pursuant to Exemption 7(E).  *See, e.g.*, *Yagman v. U.S. Dep't of Justice*, No. CV

13-0354 PA (Ex), 2014 WL 1245305, at *10 (C.D. Cal. Mar. 22, 2014) (FBI properly withheld

information pursuant to Exemption 7(E) that included "numerous non-public investigative

techniques and procedures utilized by the FBI to pursue its law enforcement and intelligence

gathering missions, and also non-public details about procedures that are otherwise known to the

public"), *aff'd sub nom. Yagman v. U.S. Bureau of Prisons*, 605 F. App'x 666 (9th Cir. 2015).

### b.  "Sources" Document

Bristow explains that the second, fourth, fifth, sixth, seventh, and eighth bullet points in

the Sources document on page 048 of the Appendix "identify the materials that Border Patrol

utilized to gather the law enforcement sensitive information" in the Assessments & Judgments

document.  Bristow Decl. ¶ 11(e).  The sources, thus, are part and parcel of the law enforcement

techniques and procedures derived therefrom, with CBP's choice of those sources itself revealing

strategic choices.  CBP plausibly contends that, "[b]y learning what inputs agencies utilize (and

what information agencies may not consider) in their decision making processes, . . . individuals

would be able to tailor their efforts to circumvent law enforcement accordingly."  Response at 18.[9]

---

[9] The ACLU protests that (i) CBP improperly relies on Exemption 7(E) because "'sources'" "do not qualify as 'techniques' or 'procedures'" but are, instead, protected by Exemption 7(D), 5 U.S.C. § 552(b)(7)(D), which CBP does not invoke, and (ii) it is unclear from the Response and the Bristow Declaration whether these sources are otherwise public.  Reply at 9-10.  While CBP terms the underlying materials on which it relies "Sources," they are not "confidential sources" in the sense meant by Exemption 7(D).  *See* 5 U.S.C. § 552(b)(7)(D) (protecting "records or information compiled for law enforcement purposes" that "could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source").  One can infer from the Bristow Declaration that the sources are either nonpublic or that this is a nonpublic use of publicly known information.  *See* Bristow Decl. ¶ 11(e) (noting that the sources include "a link that reveals the geographic coordinates of an area where Border Patrol will likely conduct future patrol and enforcement operations that, if disclosed, would give an advantage to those seeking to avoid encounters with Border Patrol" or place agents in harm's way; asserting, as to the sources material generally, "Making this information publicly available would allow individuals seeking to circumvent law enforcement to

CBP, thus, carries its burden to demonstrate the appropriateness of the redaction of this material pursuant to Exemption 7(E).

### 7. Checkpoint Procedures, Frequency, and Database, Appendix at 053-54

This set of disputed redactions pertains to a May 2018 memorandum titled "Checkpoint Operational Strategies and Requirements" on pages 053-54 of the Appendix that contains four substantive paragraphs, the bulk of which is redacted.  *See* Response at 20-22.  For the reasons that follow, I overrule the ACLU's objections to this set of redactions, concluding that CBP carries its burden to show that the redacted information bears on "techniques and procedures for law enforcement investigations[,]" the disclosure of which "could reasonably be expected to risk circumvention of the law[.]" 5 U.S.C. § 552(b)(7)(E); *see also, e.g., ACLU of Me.*, 2019 WL 2028512, at *2.

Bristow explains that the (i) the paragraph titled "Checkpoint Internal Operating Procedure" contains "details regarding the implementation and use of certain technologies employed by the Border Patrol to collect information during checkpoint operations[,]" (ii) the paragraph titled "Checkpoint Status in the [REDACTED] . . . outlines the frequency of checkpoint operations and contains details regarding a database in which checkpoint activity is maintained[,]" and (iii) the paragraph titled "Deployment and Training of [REDACTED] at U.S. Border Patrol Checkpoints" "includes details regarding the implementation and use of certain technologies, which are designed to detect materials that could be used in a terrorist attack or could pose a threat to the safety of the agents working the checkpoint."  Bristow Decl. ¶ 13.[10]  He avers that all of

---

discern the 'raw materials' and information that Border Patrol uses to develop its enforcement procedures, strategies, and tactics.").

[10] The redacted material under the third heading technically consists of two paragraphs.  However, it is clear from my *in camera* review that Bristow refers to both of those paragraphs in describing the detail contained therein and the impact of its release.

these procedures and techniques "are likely to be employed during future Border Patrol operations." *Id*.

Bristow reasonably concludes that (i) release of the information redacted from the first paragraph "would reveal details regarding the implementation and use of certain technologies employed by the Border Patrol to collect information during checkpoint operations[,]" enabling individuals to "use this information to circumvent the law by tailoring or adapting their activities, knowing the specific information Border Patrol uses to develop [its] enforcement strategies[,]" (ii) release of the information redacted from the second paragraph "would reveal . . . how the Border Patrol collects and analyzes information during checkpoint operations[,]" enabling individuals seeking to avoid detection to "learn information regarding the likelihood that checkpoint operations were taking place at a given time[,]" and (iii) disclosure of the information redacted from the third paragraph "could hamper Border Patrol's enforcement activities by revealing details on the implementation and use of [the described] technology," enabling adversaries "to circumvent it" and placing Border Patrol agents at risk through the disclosure of "details about the technologies and devices that are used to ensure the safety of agents during checkpoint operations." *Id*.

CBP, thus, carries its burden to demonstrate the appropriateness of the redaction of this material pursuant to Exemption 7(E).

## 8.  Data Collected, Reports Generated during Checkpoint Operations, Appendix at 055

This set of disputed redactions concerns the memorandum titled "[REDACTED] Temporary Checkpoint Operations Collection Emphasis" at page 055 of the Appendix, which "relates to temporary checkpoint operations that took place in the Houlton Sector."  Response at 22.  For the reasons that follow, I overrule the ACLU's objections to these redactions, concluding that CBP carries its burden to show that the redacted information bears on "techniques and

procedures for law enforcement investigations[,]" the disclosure of which "could reasonably be expected to risk circumvention of the law[.]"  5 U.S.C. § 552(b)(7)(E); *see also, e.g.*, *ACLU of Me.*, 2019 WL 2028512, at *2.

Bristow notes that "the document references internal details regarding information gathering procedures and methods, including discussion of non-public systems and reports, during checkpoint operations[,]" for example, highlighting "in detail certain categories of 'priority' information that Border Patrol seeks to collect during checkpoint operations."  Bristow Decl. ¶ 14. He avers that, although the document references two prior checkpoint operations, "similar collection techniques and procedures are likely to be employed at future checkpoint operations." *Id*.  He plausibly concludes that "[t]his information would reveal the methods in which Border Patrol collects and analyzes information regarding illegal activity[,]" which "would make known the focus of Border Patrol in conducting checkpoint operations, which adversaries could use to evade apprehension."  *Id*.  CBP, thus, carries its burden to demonstrate the appropriateness of the redaction of this material pursuant to Exemption 7(E).

### 9.  "Information for Illegal Immigration," Appendix at 056-58

The final set of disputed redactions concerns a document titled "Information for Illegal Immigration [REDACTED] pulled from: (U//FOUO) Houlton Sector Outbound Travel Patterns and Illicit Movement of People [REDACTED]" on pages 056-58 of the Appendix that CBP asserts "contains sensitive, non-public reports of law enforcement activities in Houlton Sector."  Response at 24 (citing Bristow Decl. ¶ 15).  For the reasons that follow, I sustain the ACLU's objections in part, with respect to CBP's redaction of the substance and dates of criminal activity previously observed, and otherwise overrule them, concluding that, as to the remainder of the redactions, CBP carries its burden to show that the redacted information bears on "techniques and procedures for

law enforcement investigations[,]" the disclosure of which "could reasonably be expected to risk circumvention of the law[.]"  5 U.S.C. § 552(b)(7)(E); *see also, e.g.*, *ACLU of Me.*, 2019 WL 2028512, at *2.

As Bristow notes, "the withheld information . . . concern[s] specific internal incident numbers, event codes, and details regarding apprehensions."  Bristow Decl. ¶ 15.  However, to the extent that the redacted information describes encounters with, or arrests of, certain individuals on specific dates, neither CBP nor Bristow explains how this information constitutes a technique or procedure of law enforcement, *see* Response at 23-25; Bristow Decl. ¶ 15, and it is not self-evident that it does.  CBP, hence, fails to carry its burden to show that this material qualifies for protection pursuant to Exemption 7(E).  *See*, *e.g.*, *Am. Civil Liberties Union*, 2016 WL 4411492, at *6.

However, with respect to all redacted information other than the substance and dates of arrests, I overrule the ACLU's objections.  Bristow plausibly concludes that the release of this information, which includes "specific internal incident numbers" and "event codes," "could assist unauthorized users who gain improper access to law enforcement databases in deciphering the meaning of the internal incident numbers and codes."  Bristow Decl. ¶ 15.  He explains that the information has "continuing relevance to Houlton Sector's patrol and enforcement operations" because CBP maintains it "as investigative data that allows Border Patrol to identify and prevent future illegal border activity."  *Id*.  This information consists of (i) the bolded text immediately preceding the colons (":") in all numbered paragraphs and (ii) the internal codes in parentheticals in the first, and third through sixth, paragraphs of pages 056-57 of the Appendix and the first through fifth and eighth paragraphs on pages 057-58.  CBP carries its burden to demonstrate the appropriateness of the redaction of this data.  *See, e.g.*, *Parker v. U.S. Immigration & Customs Enforcement*, 283 F. Supp. 3d 89, 100 (D.D.C. 2017) (ICE properly withheld "sensitive database

and event codes, identification numbers, law enforcements URLs, internal website links, record identification numbers, event numbers, category codes . . . file numbers . . . status codes, internal agency codes, case numbers . . . and system codes" under Exemption 7(E) (citation and internal quotation marks omitted)).

### III.  Conclusion

For the foregoing reasons, I **SUSTAIN** in part and otherwise **OVERRULE** the ACLU's objections to the still-disputed redactions made by CBP and **ORDER** that, no later than July 20, 2020, ICE and CBP produce to the ACLU documents with the following previously-redacted information unredacted:

### A.  Agreed-Upon Disclosures

1.      By agreement of the parties, and in the discretion of ICE and CBP without admitting that the redaction of such information was improper, domain names in email addresses (for example, @cbp.gov, @ice.gov, @maine.gov, @nhgov, or @vermont.gov), throughout ICE's and CBP's entire production, *see* Objection at 18-19; Response at 2;

2.      By agreement of ICE, in its discretion and without admitting that any of the challenged redactions are improper pursuant to Exemptions 5 and 7(E), all of the material in the Appendix that it previously redacted, *see* Response at 2 nn. 1-2, 5 nn. 5-6, 6 n.8;

3.      By agreement of CBP, in its discretion and without admitting that any of the challenged redactions are improper pursuant to Exemption 7(E):

      a.      The material in the first and second sentences of the paragraph beginning with the word "Gents" on pages 002 and 007 of the Appendix 002, see Response at 4 n.4;

      b.      The material preceding the words "Border Patrol Station" on pages 004 and 005 of the Appendix, see id. at 5 n.7;

c.      The material on pages 016 and 017 of the Appendix, see id. at 6 n.9;

d.      The material immediately preceding the words "Immigration Checkpoint" at the top of page 030 of the Appendix, see *id*. at 7 n.10;

e.      The material immediately preceding the words "CHECKPOINT COLLECTION STRATEGY" on page 031 of the Appendix, *see id*. at 10 n.13;

f.      The material on page 032 of the Appendix, *see id*. at 10 n.14;

g.      The material on pages 036-37 of the Appendix, see *id*. at 13 n.15;

h.      The material immediately preceding the words "Synchronization Matrix" at the top of page 046 of the Appendix, *see id*. at 16 n.16;

i.      The material in the sixth bullet point on page 047 of the Appendix, *see id*. at 17 n.17;

j.      The material in the first bullet point on page 048 of the Appendix, *see id*. at 18 n.18;

k.      The material immediately preceding the words "Immigration Checkpoint" at the top of page 052 of the Appendix, *see id*. at 19 n.19;

l.      The material in the second full paragraph of page 053 of the Appendix immediately preceding the words "Chief Patrol Agents will ensure[,]" *see id*. at 20 n.20;

m.      The material immediately preceding the words "Temporary Checkpoint Operations Collections Emphasis" and the entirety of the paragraph containing the words "will conduct temporary checkpoint operations on" on page 055 of the Appendix, *see id*. at 22 n.21; and

n.      The material immediately preceding the words "pulled from" and immediately following the words "Movement of People" on page 056 of the Appendix, as

well as the material directly below the URL link to the pressherald.com article on page 058 of the Appendix, *see id*. at 24 n.22.

### B.  Disputed Disclosures

1.      Two references in the body of the email "FW: How is this?" on page 009 of the Appendix to a route upon which checkpoints take place that spans hundreds of miles;

2.      The "name of a certain unit within U.S. Border Patrol" in the documents titled "Houlton Sector" and "Contact Information" on pages 031 and 050 of the Appendix;

3.      The third bullet point on page 047 of the Appendix;

4.      Descriptions on pages 056-58 of the Appendix of the substance and dates of criminal activity in 2017, with the proviso that (i) the bolded text immediately preceding the colons (":") in all numbered paragraphs and (ii) the internal codes in parentheticals in the first, and third through sixth, paragraphs of pages 056-57 of the Appendix and the first through fifth and eighth paragraphs on pages 057-58 of the Appendix remain redacted.

### *NOTICE*

*In accordance with Federal Rule of Civil Procedure 72(a), a party may serve and file an objection to this order within fourteen (14) days after being served with a copy thereof.*

*Failure to file a timely objection shall constitute a waiver of the right to review by the district court and to any further appeal of this order.*

Dated this 6th day of July, 2020.

/s/ John H. Rich III
John H. Rich III
United States Magistrate Judge

24